IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

PHOENIX RENOVATION CORP.,        )
d/b/a Phoenix Construction,      )
Inc. and Plumbing Express        )
                                 )
          Plaintiff,             )
                                 )        1:05cv1196(JCC)
     v.                          )
                                 )
PETER RODRIGUEZ, *et al.*        )
                                 )
          Defendants.            )

**M E M O R A N D U M   O P I N I O N**

This matter comes before the Court on the parties'
cross-motions for partial summary judgment and Defendants' motion
*in limine* seeking to exclude the testimony of Plaintiff's expert
witness.  For the following reasons, the Court will grant
Plaintiff's motion for partial summary judgment, grant
Defendants' motion for partial summary judgment in part and deny
it in part, and deny Defendants' motion *in limine*.

## I.  Background

Plaintiff, Phoenix Renovation Corporation ("Phoenix"),
is a plumbing company that specializes in the niche market of
polybutylene pipe replacement.  The individual defendants, Radek
Koci and Peter Rodriguez, formerly performed polybutylene pipe
replacement services for Phoenix, first as employees and then as
independent contractors.  On February 25, 2000, Koci entered into
a Subcontractor Agreement with Phoenix that contained non-
competition and non-solicitation clauses, as well as a covenant

not to disclose or use Phoenix's trade secrets and proprietary information.  Rodriguez signed an identical agreement with Phoenix on March 23, 2000.

In June 2003, Koci and Rodriguez terminated their contractual relationships with Phoenix.  Around the same time, Koci and Rodriguez formed Atlantic Replumbing, L.L.C. ("Atlantic").  Thereafter, under Atlantic's name, they began marketing themselves as the Washington D.C. area's polybutylene pipe replacement experts and began supplying polybutylene pipe replacement services.  Shortly after beginning to do business, Defendants began to use a consumer contract form that was substantially similar to the Interior Repipe Agreement used by Phoenix for each of its polybutylene pipe replacement projects between 2002 and 2005.  The 2002 Interior Repipe Agreement was a document containing original content, and on August 4, 2005, Phoenix applied to register the document with the United States Copyright Office.

On October 14, 2005, Phoenix filed a nine-count complaint in this Court against Koci, Rodriguez, and Atlantic. Count I alleged that Defendants reproduced and distributed the original content from Phoenix's 2002 Interior Repipe Agreement without Phoenix's authorization, in violation of 17 U.S.C. § 501. The remaining eight counts asserted claims for breaches of Koci's and Rodriguez's subcontractor agreements, tortious interference

with the contracts of various Phoenix employees and Phoenix's business expectancies, Koci's tortious interference with the Rodriguez Subcontractor Agreement, Rodriguez's tortious interference with the Koci Subcontractor Agreement, unfair competition, and civil conspiracy.  These claims were based on an alleged course of business in which Defendants solicited other Phoenix employees to work for Atlantic and targeted potential customers by using proprietary information developed by Phoenix. On December 8, 2005, this Court entered a Memorandum Opinion and Order dismissing Count VIII, the unfair competition claim.

On June 16, 2006, Phoenix filed a motion for partial summary judgment seeking only a determination of liability with respect to Count I.  On the same date, Defendants filed a motion for partial summary judgment seeking dismissal of Counts I, II, III, V, VI, and IX, as well as any claims for compensatory damages.  These motions are currently before the Court.

## II.  Standard of Review

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, pleadings, or other evidence, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  Rule 56 mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party is not entitled to summary judgment if there is a genuine issue of material fact in dispute.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of fact exists if a reasonable jury could return a verdict for a nonmoving party.  *See id.*  In other words, summary judgment appropriately lies only if there can be but one reasonable conclusion as to the verdict.  *See id.*  As the Fourth Circuit explained,

> [W]e must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. Summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove.

*Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992) (citations omitted), *abrogated on other grounds in Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).

### III.  Analysis

A.  Copyright Infringement

      1.  Plaintiff's Motion as to Liability

      Phoenix's motion for partial summary judgment seeks a determination that Defendants are liable for copyright infringement of Phoenix's 2002 Interior Repipe Agreement.  Legal forms, if original, may properly be the subject of copyright protection.  *See Merritt Forbes & Co. v. Newman Inv. Sec., Inc.*, 604 F. Supp. 943, 950-51 (S.D.N.Y. 1985) (rejecting an argument that bond documents are *per se* uncopyrightable).  To establish a copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

      Effective August 5, 2005, the United States Copyright Office registered the 2002 Interior Repipe Agreement as an original work authored by Phoenix.  This constitutes *prima facie* evidence of the validity of Phoenix's copyright.  *See* 17 U.S.C. § 410(c).  As such, Defendants bear the burden of proving the invalidity of Phoenix's copyright.  *See, e.g.*, *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985); 3-12 *Nimmer on Copyright* § 12.11[B].

      Defendants call into question the originality of the Interior Repipe Agreement, arguing that the Agreement merely

-5-

incorporates numerous boilerplate contractual clauses. Defendants rely exclusively on portions of the deposition of John Ellis, co-owner of Phoenix and ostensible author of the Interior Repipe Agreement, in which Ellis pointed to various provisions on page one of the Agreement.  Defendants claim that the provisions cited by Ellis are facially lacking in originality.  This showing is insufficient, however, to meet Defendants' burden and withstand a summary judgment motion.

According to the Fourth Circuit, "the standard for originality of a compilation or derivative work is minimal and of a low threshold, and is modest at best."  *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 438 (4th Cir. 1986) (internal quotation marks and citations omitted).  A work is "original" if the author independently created it and "it possesses at least some degree of minimal creativity."  *Feist Publ'ns*, 499 U.S. at 345.  In other words,

> in copyright law "[a]ll that is needed to satisfy [the originality requirement under] both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'  Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's addition', it is enough if it be his own."

*M. Kramer Mfg. Co.*, 783 F.2d at 438 (quoting *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102-03 (2d Cir. 1951)).

While certain provisions of the 2002 Interior Repipe Agreement appear to be composed of standard boilerplate language,

other portions appear to be included because of particular circumstances surrounding the polybutylene pipe replacement industry.  For example, Paragraph III provides, *inter alia*, that "Company disclaims and shall not be responsible for failure of the existing supply system scheduled for replacement, or Company connections thereto, that may occur prior to or during performance of Services . . . ."  (Pl.'s Mem. Ex. A.)  Ellis testified that he created this provision and included it in the Agreement specifically because Phoenix performed replacement services for houses with polybutylene pipe, which is known to be a defective product.  (*See* Defs' Opp'n Ex. 1, at 95.)  Paragraph X of the Interior Repipe Agreement provides that "Client represents that Client has reviewed the rights of Client pursuant to class action settlements involving polybutylene pipe systems. Client recognizes that performance of the Service may adversely effect Client's eligibility for compensation from such settlements."  (Pl.'s Mem. Ex. A.)  Again, Ellis testified that he created and included this provision because of the peculiar nature of the polybutylene pipe replacement industry.  (*See* Defs' Opp'n Ex. 1, at 100.)

        Although some clauses in the Interior Repipe Agreement appear to be standard boilerplate language, Defendants have failed to produce evidence showing that the provisions were merely copied from other works, other than Ellis's admissions

-7-

that he did not create certain phrases like "timely and workmanlike manner," and "acts of God, labor disruption, or client default."  (*See* Defs' Opp'n Ex. 1, at 81.)  For example, Defendants have not produced a single form contract supporting their claim that the Interior Repipe Agreement contains mere boilerplate language.  In the presence of evidence demonstrating that Ellis created other clauses in the Agreement, Defendants' showing is insufficient to meet their burden.  Ellis's original creation of certain portions of the Agreement is sufficient to satisfy the minimal threshold required for originality.  Accordingly, the Court concludes that Phoenix possesses a valid copyright.

The second element required to establish an infringement claim is "copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc.*, 499 U.S. at 361.  A side-by-side comparison of the 2002 Interior Repipe Agreement and Atlantic's consumer contract reveals that the two documents are identical in all material respects.  Defendant Koci even agreed in his deposition that a substantial portion of the language in the two agreements is identical.  (*See* Pl.'s Mem. Ex. F, at 10-11.)  Moreover, in responding to Defendants' cross-motion for partial summary judgment, Phoenix provided evidence that Defendants used language that delineated Atlantic's responsibilities for certain types of property damage claims in

-8-

various consumer transactions.  The language used by Defendants in these circumstances was virtually identical to revenue-saving language contained within Phoenix's Interior Repipe Agreement and demonstrably establishes that Defendants copied and used the constituent elements of the Interior Repipe Agreement.

Finally, Defendants argue that their use of the Interior Repipe Agreement constituted an innocent infringement. While the defense of innocent infringement can impact the remedies available against a defendant for copyright infringement, it "will not constitute a defense to a finding of liability." 4-13 *Nimmer on Copyright* § 13.08.  As Phoenix only seeks summary judgment on the issue of liability, the Court will not consider this defense in the present context.

As Phoenix has established the ownership of a valid copyright in the Interior Repipe Agreement and copying of the constituent elements of that work, the Court will grant Phoenix's motion for partial summary judgment.  The Court will enter judgment against Defendants on the issue of liability, reserving the question of damages for trial.

<u>2.  Defendants' Motion as to Damages</u>

Upon an infringement of a copyright, the Copyright Act entitles the copyright owner to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages."  17 U.S.C.

-9-

§ 504(b).[1]   Section 504(b) goes on to provide that

> [i]n establishing the infringer's profits, the
> copyright owner is required to present proof only of
> the infringer's gross revenue, and the infringer is
> required to prove his or her deductible expenses and
> the elements of profit attributable to factors other
> than the copyrighted work.

*Id.*  Thus, the statute "creates an initial presumption that the infringer's 'profits . . . attributable to the infringement' are equal to the infringer's gross revenue."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 520 (4th Cir. 2003). After the copyright owner establishes the amount of the infringer's gross revenues, "the burden shifts to the infringer to prove either that part or all of those revenues are 'deductible expenses' (i.e., are not profits), or that they are 'attributable to factors other than the copyrighted work.'  *Id.* The infringer does not have to prove these amounts "with mathematical precision."  *Id.*

The Fourth Circuit has also instructed that despite § 504(b)'s burden-shifting provision, there are some circumstances in which summary judgment in favor of an infringer "with respect to some portion of the infringer's gross revenues" is appropriate.  *Id.*  In short, the infringing party

---

[1]The Copyright Act also provides for the recovery of statutory damages in lieu of actual damages and profits, *see* 17 U.S.C. § 504(c), but in this case, Phoenix has not sought statutory damages.  In its opposition to Defendants' motion for summary judgment, Phoenix has also disclaimed any intent to pursue actual damages at trial.  (*See* Pl.'s Opp'n at 19.)

could properly be awarded summary judgment with respect
to any given revenue stream if either (1) there exists
no conceivable connection between the infringement and
those revenues; or (2) despite the existence of a
conceivable connection, [the copyright owner] offered
only speculation as to the existence of a causal link
between the infringement and the revenues.

*Id.* at 522-23.  In other words, "[t]he copyright owner thus has

the burden of demonstrating some causal link between the

infringement and the particular profit stream before the

burden-shifting provisions of § 504(b) apply."  *Bonner v. Dawson*,

404 F.3d 290, 294 (4th Cir. 2005).

In this case, Phoenix anticipates presenting evidence

at trial that Defendants' use of Phoenix's Interior Repipe

Agreement enabled Defendants to enter into 626 transactions in

which they received approximately $2.6 million in revenue.  This

is the amount that Phoenix cites as Defendants' "gross revenue,"

within the meaning of § 504(b).  Defendants assert that this

figure merely represents Atlantic's overall revenue from

performing polybutylene pipe replacement work during the time

period that Defendants used the consumer contract at issue.  They

argue that in attempting to lay claim to this total sum, Phoenix

has failed to demonstrate a causal connection between the

infringement and the claimed "gross revenue."

To be sure, "a literal interpretation of 'gross

revenue' in § 504(b) to include all profits produced by an

infringer, no matter the source, would be incorrect.  Rather,

-11-

'gross revenue' refers only to revenue reasonably related to the infringement." *Bonner*, 404 F.3d at 294 (internal citation omitted).  In this case, however, Phoenix does not indiscriminately seek all of Defendants' profits without regard to the source.  In fact, it may be entirely appropriate for Phoenix to seek the totality of Defendants' profits from the time period that Defendants used the infringing contract, as the evidence suggests that the income derived from polybutylene pipe replacement services is Defendants' only stream of revenue.

It is this fact that distinguishes the instant case from *Bouchat*, upon which Defendants heavily rely.  In *Bouchat*, the plaintiff, who held a copyright of the Baltimore Ravens' logo, contended that some portion of all of the Ravens' revenues was attributable to the infringing use of the plaintiff's copyright.  *See* 346 F.3d at 517.  The Fourth Circuit noted that the Ravens had six distinct streams of revenue, only two of which were based on the sale of team merchandise.  *Id.* at 523.  The district court had granted partial summary judgment for the Ravens with respect to all non-merchandise streams of revenue, which included income from sources such as ticket sales and game-day parking.[2]  *Id.* at 518-19.  The Fourth Circuit affirmed this

---

[2]The district court later found it appropriate to exclude certain subsets of the merchandise revenue streams, finding no rational connection between these sub-streams and the infringement.  *See id.* at 518.  The Fourth Circuit also affirmed this aspect of the district court's decision.  *See id.* at 524-26.

ruling, reasoning that the defendants had demonstrably established the absence of a causal link between the infringement and the non-merchandise revenue streams, whereas the plaintiff rested on speculative evidence to attribute the entirety of the Ravens' revenues to the infringement. *See id.* at 526.

By contrast, the case at bar presents a situation in which Defendants had only one stream of revenue:  income from polybutylene pipe replacement jobs.  This is not a case where Defendants have separated out certain aspects of their revenues and demonstrated that such streams are not causally related to the infringement.  As will be discussed below, Phoenix has offered non-speculative evidence to establish a causal link between the infringement and Defendants' sole source of revenue during the relevant time period.

Regarding the causal link, Defendants argue that their use of Phoenix's Interior Repipe Agreement did not lead to any revenue.  According to Koci's affidavit, the consumer sales contract was merely a final, ministerial step taken in reaching an agreement between Atlantic and its customers.  In every transaction, Atlantic would assess the work to be done and offer the customer a proposal for the cost of Atlantic's services. Atlantic never presented the consumer contract to any customer until after it had reached a verbal agreement with the customer. Because Atlantic did not use the contract as a point of sale,

Defendants argue that none of their revenues are traceable to the copyright infringement.

However, Defendants misconceive the nature of Phoenix's initial burden under § 504(b).  It is not necessary for Phoenix to establish that the copyright infringement was the sole reason that Defendants garnered the revenue in question, or even that the infringement was a major factor in producing this revenue stream.  Phoenix's initial burden is merely to establish a causal link between the infringement and the claimed revenue.  *See Bonner*, 404 F.3d at 294.  The fact that Defendants' profits may be attributable to factors other than the infringement reveals the need for an apportionment of profits, but under § 504(b), the burden for such an apportionment belongs to Defendants.  *See Konor Enter., Inc. v. Eagle Publ'ns, Inc.*, 878 F.2d 138, 141 (4th Cir. 1989).

Several factors demonstrate the existence of a causal link between the infringement and the revenue stream.  First, Virginia law requires licensed residential contractors "to make use of a legible written contract clearly specifying the terms and conditions of the work to be performed."  18 Va. Admin. Code § 50-22-260(B)(8).  Thus, Defendants' use of Phoenix's Interior

Repipe Agreement enabled them to engage in residential contracting.[3]

Second, Phoenix has submitted evidence showing that Defendants used a generic form contract purchased from an office supply store for a short period of time after it began doing business.  Thereafter, Defendants began using the consumer contract that was based on Phoenix's Interior Repipe Agreement. Phoenix points out that this had several beneficial effects for Defendants.  Use of Phoenix's agreement enabled Defendants to market themselves as identical to Phoenix with respect to the terms and conditions of their services, yet lower priced than Phoenix because of lower overhead, insofar as Defendants did not have to create and improve their own consumer contract.  Use of the Interior Repipe Agreement, as opposed to a generic form contract, also assisted Defendants in presenting themselves as polished and professional.  These effects, in turn, generated more customers and more revenue for Defendants.

Third, Defendants' use of the Interior Repipe Agreement had a revenue-retaining effect.  The Interior Repipe Agreement

---

[3]Certainly, Virginia law did not require a contract form substantially similar to Phoenix's Interior Repipe Agreement, and Defendants could have met the regulatory requirements with a contract form that they themselves had generated.  In this regard, the majority of Defendants' profits were likely not attributable to their use of Phoenix's Interior Repipe Agreement to surmount this hurdle to doing business.  At this stage in the litigation, however, it is only relevant that Defendants' use of the Agreement for this purpose contributed to at least a portion of their revenues.  At trial, Defendants will have the opportunity to present evidence regarding the profits they would have made if they had originally generated a consumer contract.

contained specific revenue-saving language that delineated Phoenix's responsibilities for certain types of property damage claims.  Atlantic's consumer contract contained substantially identical language.  Phoenix has presented evidence that Defendants relied on this language to demand payment or avoid conflict with its customers on at least three separate occasions.  Thus, an undetermined portion of Defendants' revenues is attributable to Defendants' use of the Interior Repipe Agreement's revenue-saving language.

Accordingly, for the reasons set forth above, Phoenix's evidence is sufficient to prove the existence of a causal link between the infringement and the entirety of Defendants' revenues garnered in the time period that they used the infringing contract.  Because the claimed revenue has a reasonable relation to the infringement, the Court concludes that summary judgment for Defendants would be inappropriate.

B.  Non-Solicitation Clauses

The Subcontractor Agreements signed by Koci and Rodriguez both contained the following language:

> The Subcontractor shall not solicit or service, directly or indirectly or through a third party, any present or prospective customer or client of the Company for the replacement of polybutylene pipe, for a period of one (1) year after the termination of the subcontract.

(Pl.'s Opp'n Ex. 1, 2.)  Defendants argue that these non-solicitation clauses are overly broad and unenforceable.

The enforceability of a restrictive covenant is a question of law.  *Omniplex World Servs. Corp. v. U.S. Investigations Servs.*, 618 S.E.2d 340, 342 (Va. 2005). Restrictive covenants will be enforced "if the contract is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy."  *Id.*  Analysis of these factors requires consideration of the restriction's effect in terms of "function, geographic scope, and duration." *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001).  These factors must not be considered as separate and distinct issues; rather, they must be considered together.  *Id.*  Furthermore,

> the employer has the burden of proving that the restraint is reasonable and the contract is valid. Since the restraint sought to be imposed restricts the employee in the exercise of a gainful occupation, it is a restraint in trade, and it is carefully examined and strictly construed before the covenant will be enforced.

*Richardson v. Paxton Co.*, 127 S.E.2d 113, 117 (1962).

The functional restriction and the duration of the non-solicitation clauses are clear:  Koci and Rodriguez were prevented from performing polybutylene pipe replacement services for one year.  The restrictive covenant has no express geographic limitation, but rather prevents solicitation or service of "any present or prospective customer or client of the Company." (Pl.'s Opp'n Ex. 1, 2.)  The meaning of this phrase is open to

interpretation[4] and is the subject of the parties' dispute.
Defendants point out that the Subcontractor Agreements contained
no language defining "prospective customer or client" and that
Phoenix did not discuss the term with Koci or Rodriguez when they
signed the agreements or when they terminated their contractual
relationships with Phoenix.  Phoenix argues that the phrase
refers to all individuals who lived on streets and in
neighborhoods where Phoenix already performed polybutylene pipe
replacement services, thereby learning that such streets and
neighborhoods likely contained additional houses with
polybutylene pipes.

The Fourth Circuit, applying Virginia law, has
previously rejected an argument similar to Phoenix's.  *See Alston
Studios, Inc. v. Lloyd V. Gress & Assoc.*, 492 F.2d 279 (1974).
In *Alston*, the issue under consideration was the enforceability
of an employment agreement's non-competition clause, which
contained no express geographic limitation.  *See id.* at 283.  The
employer argued that the employment agreement contained an
implicit geographic limitation of Maryland, Virginia, and
Washington, D.C.  The Fourth Circuit rejected this implicit
limitation, reasoning that the non-competition clause, as a
restraint on trade, must be read literally and strictly construed

---

[4]Phoenix notes that the term "prospective" means "expected, likely,
future."  *See* Webster's New World Dictionary (2d ed. 1986).  This elaboration
on the term does little, however, to define its meaning in the context of
Phoenix's prospective customers or clients.

in favor of the employee.  *Id.* at 285.  As such, the Fourth Circuit construed the non-competition clause as an attempt to impose a post-employment restraint without geographic limitation. *Id.*

Likewise, this Court is bound to strictly construe the non-solicitation clauses in favor of Koci and Rodriguez.  In this context, where Defendants seek a judgment declaring the non-solicitation clauses unenforceable, this means giving the clauses their broadest possible interpretation.  *See id.*  *See also Simmons*, 544 S.E.2d at 678 ("Because restrictive covenants restrain trade, non-competition clauses are strictly construed against the employer.").  At oral argument on this motion, the parties agreed that Phoenix conducts business in thirty-eight states.  As such, the Court construes the phrase "prospective customer or client" to cover anyone in these thirty-eight states who might call upon Phoenix in the future to perform polybutylene pipe replacement services, or, in other words, any household in these thirty-eight states that has polybutylene pipe.

The Court finds that these non-solicitation clauses, so construed, were substantially broader than necessary to protect Phoenix's legitimate business interests.  Phoenix argues that the restrictions were necessary to protect proprietary information

that is essential to its business.[5]  Phoenix's arguments have some validity, insofar as Koci and Rodriguez could have used their subcontractor relationships with Phoenix to gather information about households containing polybutylene pipe.  As Koci and Rodriguez only performed subcontractor services for Phoenix in the metropolitan D.C. area, however, the information they could have gained would have only pertained to that area.  A restriction barring Koci and Rodriguez from soliciting customers for polybutylene pipe replacement services in thirty-eight states was therefore substantially broader than was necessary to protect Phoenix's legitimate business interests.

The Court also finds that the non-solicitation clauses were unduly burdensome on the abilities of Koci and Rodriguez to earn a living.  While it appears that Koci was able to perform general plumbing work and Rodriguez was qualified to perform drywall work, the non-solicitation clauses completely excluded them from the polybutylene pipe replacement market in a substantial geographic area for a one-year period.  In light of

_____

[5]Specifically, Phoenix points out that the polybutylene pipe replacement market is a specialty niche market within the overall plumbing industry.  The market is finite, meaning that after a house with polybutylene pipes has had the pipes replaced, there is no continued need for the service.  There is no publicly available database of structures containing polybutylene pipe.  In light of these realities, Phoenix used information regarding its past customers to identify streets and neighborhoods where the houses were likely to have polybutylene pipe, and Phoenix then targeted its advertising and marketing toward these locations.  Phoenix argues that the non-solicitation clauses prevented its subcontractors from competing with Phoenix while using this proprietary information to avoid spending significant amounts of money in a non-targeted marketing campaign.

the lack of a geographic limitation, this restriction unduly hindered their abilities to earn a living.

Finally, the Court concludes that the non-solicitation clauses are contrary to Virginia public policy.  The restriction placed by the clauses on Defendants' abilities to earn a living is not justified by a corresponding benefit to Phoenix.  As previously stated, the broad geographical application is completely unnecessary to Phoenix's interests in protecting its proprietary information.  As such, the Court holds that the non-solicitation clauses are unenforceable and void.

Because the non-solicitation clauses are geographically overbroad, the Court will grant Defendants' motion for summary judgment insofar as it seeks dismissal of Phoenix's claims based on the non-solicitation clauses.  The Court notes, however, that outright dismissal of Phoenix's claims pertaining to the Subcontractor Agreements is inappropriate.  Each of these claims is based in part on Defendants' alleged violations of other portions of the Subcontractor Agreements, including the confidentiality provisions and the covenant not to solicit Phoenix employees.  The Court will only grant summary judgment insofar as Phoenix's claims are based on alleged violations of the non-solicitation clauses.

C.  Compensatory Damages

Defendants argue that although Phoenix has sought compensatory damages for breaches of the Subcontractor Agreements, it has not quantified the compensatory damages sought in its Rule 26(a)(1) initial disclosures or any pleading.  As such, Defendants seek summary judgment against Phoenix's claim for compensatory damages for breaches of the Subcontractor Agreements.

Phoenix seeks as compensatory damages the gross profits earned by Atlantic during the one-year non-compete period, as well as Atlantic's gross profits obtained thereafter through unlawful use of Phoenix's proprietary information.  A cursory look at Phoenix's submissions reveals that Phoenix has identified the specific jobs that Defendants obtained by using Phoenix's confidential information.  Phoenix has also quantified the amount of profits that resulted from the breaches of the Subcontractor Agreements.  As such, Defendants' argument is meritless.

D.  Defendants' Motion in Limine

Defendants have also filed a motion *in limine* seeking to exclude the testimony of one of Phoenix's expert witnesses, William R. Dacey, Jr., MPA, CPA, CFE, CVA.  Phoenix anticipates that Dacey will testify about the amount of revenue gained by Atlantic from Defendants' alleged breaches of their Subcontractor Agreements, unauthorized use of Phoenix's Interior Repipe

Agreement, and the other conduct alleged in Phoenix's complaint.

Defendants claim that in calculating these revenues, Dacey merely

reviewed Atlantic's customer files, determined the amount of

revenue that Atlantic received in each transaction,[6] and

performed simple math to tally these revenues.  Defendants argue

that Dacey's conclusions and anticipated testimony would not

assist the Court in understanding the evidence or determining a

fact in issue and that his testimony should therefore be

excluded.

Federal Rule of Evidence 702 provides that

> [i]f scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is
> based upon sufficient facts or data, (2) the testimony
> is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702.  Defendants do not challenge the sufficiency

of the data used by Dacey or the reliability of Dacey's

principles and methods or his application of those principles and

methods.  Rather, Defendant's motion *in limine* is based solely on

the helpfulness of Dacey's anticipated testimony.  The Fourth

Circuit has instructed that "[t]estimony from an expert is

presumed to be helpful unless it concerns matters within the

---

[6]According to Defendants, these sums were expressly written in each of
Atlantic's customer files.

everyday knowledge and experience of a lay juror." *Kopf v. Skym*, 993 F.2d 374, 377 (4th Cir. 1993).  Furthermore, if "the proposed testimony will recount or employ 'scientific, technical, or other specialized knowledge,' it is a proper subject" for expert testimony.  *Id.*

According to Phoenix, Dacey reached his conclusions after reviewing Atlantic's voluminous contract records, which he reviewed to separate the jobs in which Atlantic used the contract based on the Interior Repipe Agreement from the jobs in which it did not.  Dacey then calculated Atlantic's revenues from the appropriate portion of these contracts, as well as the summary tax and financial records provided by Atlantic.  Phoenix argues that Dacey's testimony is necessary to determine the connection between Defendants' copyright infringement and the portion of Atlantic's revenue derived therefrom.

The Court is mindful that "[t]he subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend." *Kopf*, 993 F.2d at 377 (quoting Fed. R. Evid. 702).  Even if Dacey is not called upon to use, in Phoenix's words, "the full range of his sophisticated skill set," (Pl.'s Opp. at 4), his review of Atlantic's voluminous records, conclusions regarding the revenues stemming from the allegedly wrongful acts, and summation of these revenues may prove helpful to the Court.  Based on the information currently before it, the Court simply

cannot conclude that Dacey's testimony will be unhelpful.  The
Court will deny Defendants' motion *in limine*.

### IV.   Conclusion

        For the foregoing reasons, the Court will grant
Plaintiff's motion for partial summary judgment, grant
Defendants' motion for partial summary judgment in part and deny
it in part, and deny Defendant's motion *in limine*.  An
appropriate Order will issue.


July 7, 2006                    _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                            UNITED STATES DISTRICT COURT JUDGE

-25-