IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

PHOENIX RENOVATION CORP.,        )
d/b/a Phoenix Construction,      )
Inc. and Plumbing Express        )
                                 )
          Plaintiff,             )
                                 )         1:05cv1196(JCC)
     v.                          )
                                 )
PETER RODRIGUEZ, *et al.*        )
                                 )
          Defendants.            )

**M E M O R A N D U M   O P I N I O N**

The Plaintiff, Phoenix Renovation Corporation
("Phoenix"), brought this action alleging that the Defendants,
Peter Rodriguez, Radek Koci, and Atlantic Re-Plumbing LLC,
violated Phoenix's rights under the Copyright Act, breached their
subcontractor agreements with Phoenix, tortiously interfered with
Phoenix's business expectancies, engaged in unfair competition,
and conspired to harm Phoenix's business.  The Court conducted a
bench trial of this matter from July 18, 2006 through July 20,
2006.

At the conclusion of the Plaintiff's evidence, the
Court took under advisement Count I (copyright infringement) and
ruled that Defendants Koci and Rodriguez were entitled to
verdicts in their favor for the breach of contract claims in
Counts II and III based on allegations that they violated their
subcontractor agreements by soliciting Phoenix employees.  The
Court took under advisement the portion of the allegations in

Counts II and III concerning Defendants' breaches of agreement with Phoenix prohibiting them from disclosing or making use of any "trade secret, confidential or proprietary information of the company or its affiliates."  The Court also dismissed Count IV, for tortious interference with Phoenix' contracts and business expectancies.  The Court now makes the following findings of fact and conclusions of law.

## I.  The Parties

1.    Phoenix is a Virginia Corporation with its principal place of business in Alexandria, Virginia.  Phoenix does business under the name "Plumbing Express."  It does business in thirty-eight states, including the greater Washington, D.C. metropolitan area as Plumbing Express.  Phoenix offers specialized services in the niche market of polybutylene pipe replacement.

2.    Defendant Peter Rodriguez ("Rodriguez") is a resident of Gaithersburg, Maryland and a former subcontractor of Phoenix who performed PB Replacement services.

3.    Defendant Radek Koci ("Koci") is a resident of Virginia and a former subcontractor of Phoenix who performed PB Replacement services.

4.    Defendant Atlantic Re-Plumbing LLC is a Virginia limited liability company organized by Koci and Rodriguez on June 23, 2003 and formed to compete directly with Phoenix in the polybutylene replacement industry.

-2-

## II.  The Claims

5.    Count I of Phoenix's complaint alleges that Defendants reproduced and distributed original content from a consumer contract known as Phoenix's 2002 Interior Re-pipe Agreement, without Phoenix's authorization, in violation of the Copyright Act, 17 U.S.C. § 501.

6.    Count II alleges that Koci breached three provisions of his Subcontractor Agreement with Phoenix: (1) the covenant not to compete and not to solicit Phoenix's prospective customers or clients; (2) the covenant not to solicit Phoenix employees; and (3) the confidentiality agreement.

7.    Count III alleges that Rodriguez breached three provisions of his Subcontractor Agreement with Phoenix: (1) the covenant not to compete and not to solicit Phoenix's prospective customers or clients; (2) the covenant not to solicit Phoenix employees; and (3) the confidentiality agreement.

8.    Count IV alleges that Defendants tortiously interfered with Phoenix's contracts and business expectancies with various other Phoenix employees and subcontractors by: (1) causing at least one Phoenix employee to secretly perform polybutylene replacement work during hours in which he was to be performing such work for Phoenix; (2) attempting, successfully and unsuccessfully, to induce key Phoenix employees to terminate their employment with Phoenix; and (3) inducing Scott Davis

-3-

("Davis") to work for Atlantic, despite Defendants' awareness of his covenant not to compete against Phoenix.

9.   Count V alleges that Koci tortiously interfered with Phoenix's rights under its Subcontractor Agreement with Rodriguez, causing Rodriguez to breach his Subcontractor Agreement.

10.   Count VI alleges that Rodriguez tortiously interfered with Phoenix's rights under its Subcontractor Agreement with Koci, causing Koci to breach his Subcontractor Agreement.

11.   Count VII alleges that Defendants conspired to willfully and maliciously injure Phoenix in its business, in violation of Va. Code § 18.2-499, by tortiously interfering with Phoenix's prior employment relationship with Davis, intentionally misappropriating Phoenix's business methods and plans, infringing on Phoenix's copyright interests, and unlawfully soliciting Phoenix's employees.

12.   Count VIII alleged that Defendants engaged in various acts of unfair competition.  Upon Defendants' motion, this Court dismissed Count VIII in a Memorandum Opinion and Order dated December 8, 2005.  *See Phoenix Renovation Corp. v. Rodriguez*, 403 F. Supp. 2d 510, 517-18 (E.D. Va. 2005).

13.   Count IX alleges that Defendants engaged in a common law conspiracy to injure Phoenix in its business.

### III.   Jurisdiction

-4-

14.   This Court has jurisdiction over Phoenix's copyright infringement claim pursuant to 28 U.S.C. §§ 1331, 1338(a).

15.   This Court has supplemental jurisdiction over Phoenix's state law claims pursuant to 28 U.S.C. § 1367.

16.   This Court is a proper venue pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Phoenix's claims occurred within the Eastern District of Virginia.  Venue is also proper pursuant to 28 U.S.C. § 1400(a), since Defendants reside or may be found within the Eastern District of Virginia.

## IV.  Findings of Fact

A.  The Polybutylene Replacement Market and Phoenix's Business
     Methods

17.   John Ellis ("Ellis") and Peter Page incorporated Phoenix in 1989.  Phoenix began providing polybutylene replacement services in 1993.  (Tr. at 378).

18.   Polybutylene replacement is a niche business within the plumbing industry.  As of July 20, 2006, there are approximately sixteen companies that perform polybutylene replacement services. Three of these companies specialize in polybutylene replacement: Phoenix, Atlantic, and Mr. Renovator.  (Tr. at 611-62).

19.   The polybutylene replacement market is a finite market. After a house's polybutylene pipes have been replaced, there is

no longer any need for such services in that house. (Tr. at 132-33).

20.   There are no public records identifying buildings that contain polybutylene pipes.  Houses with polybutylene pipes are typically found, however, on the same streets or in the same neighborhoods as other houses with such pipes.  (Tr. at 384-85). For this reason, a company that learns of the existence of polybutylene pipes in one house can often accurately predict that other houses on the same street or in the same neighborhood will also contain polybutylene pipes.  (Tr. at 384).

21.   Phoenix developed, maintained, and continues to maintain records of its polybutylene replacement customer names and addresses in a proprietary database.  Phoenix invested significant resources to develop this database.  (Tr. at 382-83).

22.   Phoenix uses this proprietary database to find streets and neighborhoods where there will likely be an abundance of houses with polybutylene pipe.  Phoenix then uses targeted direct mail to market its polybutylene replacement services to the residents of these streets and neighborhoods.  (Tr. at 387-88).

23.   Phoenix does not share its customer list or its marketing lists with other businesses, and employee access to Phoenix's customer database is limited.  (Tr. at 383).

24.   Phoenix did not hold meetings or seminars to discuss marketing plans, business plans, or other trade secrets with its employees or subcontractors.  (Tr. at 152-53; Tr. at 332).

25.   When performing polybutylene replacement services, Phoenix used a consumer contract known as its Interior Re-Pipe Agreement.  (Tr. at 394-95; Pl.'s Ex. 3).

26.   Ellis developed the Interior Re-Pipe Agreement and continually revised it over time to reflect the scope of work, terms, conditions, and exclusions that he learned should be applicable to polybutylene replacement services.  Ellis included terms in the Interior Re-pipe Agreement that addressed issues that had arisen from Phoenix's past experiences with customers.  Over time, Ellis spent a total of approximately 200 hours developing and revising the Interior Re-pipe Agreement.  (Tr. at 394-97).

27.   The Interior Re-Pipe Agreement was a proprietary document containing original content.  On August 2, 2005, Phoenix registered the version of the Interior Re-Pipe Agreement that it used in 2002 ("the Re-Pipe Agreement") with the United States Copyright Office.  (Pl.'s Ex. 4B).

B.  Phoenix's Former Employment/Contractual Relationships with Rodriguez and Koci

28.   In 1995, Phoenix hired Rodriguez as an employee.  While in Phoenix's employment, Rodriguez performed drywall work exclusively on polybutylene replacement jobs.  (Tr. at 46-47).

-7-

29.  Prior to his employment with Phoenix, Rodriguez had no experience with polybutylene replacement work.  Phoenix trained Rodriguez to do estimates on polybutylene replacement jobs by conducting "fixture counts," a method which entails counting the number of devices that provide a supply of water within a house. (Tr. at 47-48).

30.  In 2000, Rodriguez asked to be treated as a non-exclusive independent contractor, and Phoenix complied with this request.  (Tr. at 178).

31.  On March 23, 2000, Rodriguez entered into a written Subcontractor Agreement with Phoenix.  (Pl.'s Ex. 13).

32.  The Subcontractor Agreement identified Rodriguez as the "Subcontractor" and provided, in pertinent part, as follows:

> WHEREAS, the Company is in the business, among other things, of:  1) providing general contracting services, including, but not limited to, repairs, renovations, installations, or other improvements related to the replacement of polybutylene pipe; and 2) fulfilling emergency and routine services for property management companies, condominium associations, and property and casualty claims insurers and adjusters (the "Services");

> WHEREAS, the Company expends considerable resources to promote the Services of the Company to potential and existing customers and clients of the Company;

> . . .

> WHEREAS, the Subcontractor understands that it will not be engaged by the Company unless it agrees not to compete with the Company for the Company's business for the period specified herein;

> NOW THEREFORE, in consideration of the Company's agreement to engage the Subcontractor to provide certain

services to the Company's customers, and in consideration of the Subcontractor's desire to perform certain services for the Company and its agreement to refrain from competing for the Company's business, the parties hereto agree as follows:

### 1.  Non-Solicitation and Covenant Not to Compete

The Subcontractor shall not, during the period of the subcontract, and for a period of time of one (1) year after termination of the subcontract, directly or indirectly through a third party, engage in any business directly or indirectly related to the replacement of polybutylene pipe for any customer or client, or any affiliate of any customer or client, for which the Subcontractor has performed services under this Agreement.

The Subcontractor shall not solicit or service, directly or indirectly or through a third party, any present or prospective customer or client of the Company for the replacement of polybutylene pipe, for a period of one (1) year after termination of the subcontract.

The Subcontractor shall not, during the period of the subcontract, and for a period of one (1) year after termination of the subcontract, regardless of the cause of termination of the subcontract, directly or indirectly or through a third party, solicit, induce, or otherwise cause an employee of the Company to terminate employment with the Company to become an employee, consultant, or independent contractor to or for any person or entity.

### 2.  Disclosure of Trade Secrets and Confidential and Proprietary Information

The Subcontractor shall not, during or at any time after termination of the subcontract, without prior written authorization of the Company, disclose to, or make use of, any trade secret or confidential or proprietary information of the Company or its affiliates. Trade secrets and confidential or proprietary information include, but are not limited to:  customer lists, price lists, insurance and other third party contracts, marketing and sales and concepts, identity of key customer or client personnel and their phone numbers, the identity and requirements of customers and clients, bidding and pricing information, personnel policies and

procedures, compensation and fringe benefit programs and other sales, marketing and technical information, business plans and methods, computer programs and copyrightable work (models, processes, designs, drawings, plans, prototypes, inventions, devices, parts, improvements and other physical and intellectual property), that were disclosed to the Subcontractor or known by the Subcontract as a consequence of the subcontract and/or used by the Subcontractor to carry out its duties under this Agreement.  All trade secrets and confidential and proprietary information are the property of the Company.  Any trade secret or confidential or proprietary information developed or obtained by the Subcontractor, and/or used by the Subcontractor during the period of the subcontract shall become and remain the property of the Company.

(Pl.'s Ex. 13).

33.  Koci is a licensed master plumber who also began work as a Phoenix employee in 1995.  (Tr. at 256-57).

34.  Koci also asked to be treated as a non-exclusive independent contractor, and Phoenix complied with his request. (Tr. at 257).

35.  On February 25, 2000, Koci entered into a written Subcontractor Agreement with Phoenix that is identical in all material respects to Phoenix's Subcontractor Agreement with Rodriguez, *supra*.  (Pl.'s Ex. 8).

36.  During the time the Rodriguez and Koci worked for Phoenix, they received "pay sheets" that indicated what Phoenix would pay them, as subcontractors, for various services.  (Tr. at 337).

37.  During the time that Rodriguez and Koci worked for Phoenix, Phoenix also provided them with "job worksheets" that

-10-

contained customer names and addresses.  (Defs.' Koci Cross, Tr. at 330-31).  Phoenix did not label these "job worksheets" as confidential or proprietary information.  Phoenix never sought the return of any "job worksheets" after providing them to its subcontractors.  (Tr. at 416-17, 563-64).

38.  Neither Rodriguez nor Koci had full access to Phoenix's proprietary customer database or a written list of Phoenix's customers.  (Ellis Direct, Tr. at 382-83).

39.  Neither Rodriguez nor Koci were involved in any aspect of Phoenix's marketing or sales.  Neither Rodriguez nor Koci had access to any written Phoenix marketing or sales plan. (Tr. at 149-50; 245-46).

40.  Neither Rodriguez nor Koci had access to any written documents pertaining to Phoenix's bidding or pricing information, other than the "pay sheets" that indicated what they were paid for their own services.  (Tr. at 324-25, 327).

41.  Neither Rodriguez nor Koci was ever privy to any written document pertaining to Phoenix's business plans and methods.

C.  The Formation of Atlantic

42.  During Rodriguez's subcontractor relationship with Phoenix, he and Kenneth Cocolin ("Cocolin") began to plan forming a new polybutylene replacement business that would compete with Phoenix.  (Tr. at 25).

-11-

43.   Rodriguez and Cocolin sought a licensed master plumber for their venture and successfully recruited Koci.  (Tr. at 28).

44.   Rodriguez, Koci, and Cocolin set up a temporary office in the basement of the townhouse in which Rodriguez and Cocolin resided.  (Tr. at 26-27).

45.   In early June 2003, before Rodriguez and Koci terminated their Subcontractor Agreements with Phoenix, they solicited and performed several polybutylene replacement jobs in Sterling, Virginia, in neighborhoods where they had done polybutylene replacement work for Phoenix.  (Pl.'s Rodriguez Direct, Tr. at 46; Pl.'s Koci Direct, Tr. at 280).  In some instances, they performed polybutylene replacement services on or near streets where Koci had done work for Phoenix in May and June 2003.  (*See* Pl.'s Ex. 24, 27, 28; Defs.' Ex. 4).

46.   In June 2003, Rodriguez and Koci took steps to organize their business and named the business "Atlantic Re-Plumbing." (Cocolin Direct, Tr. at 23-33).

47.   Rodriguez and Koci terminated their subcontractor relationships with Phoenix on or about June 18, 2003.  When Ellis inquired of the two why they were terminating their relationships with Phoenix, neither Rodriguez nor Koci told Ellis that they were forming a new business.  Koci claimed that he was "burned out" on re-pipe work, and Rodriguez declined to provide any information about his plans.  (Ellis Direct, Tr. at 378-411).

-12-

48.  After approximately two months, Cocolin terminated his relationship with Atlantic after he and Rodriguez began to disagree about the scope and nature of his duties.  (Tr. at 33, 36).

D.  Defendants' Use of Information Gained While Working for Phoenix

49.  In marketing Atlantic's services, Rodriguez and Koci initially focused on delivering flyers to the same streets and neighborhoods where they had performed polybutylene replacement services for Phoenix.  (Pl.'s Koci Direct, Tr. at 270).

50.  In determining where to target their marketing, Rodriguez and Koci relied on their memories pertaining to the locations where they had performed polybutylene replacement services as Phoenix subcontractors.  Neither Rodriguez nor Koci retained any "job worksheet" given to them by Phoenix after they commenced doing business as Atlantic.  (Tr. at 271-72, 331, 610).  At no point did Defendants use Phoenix's "job worksheets" for the purposes of competing with Phoenix.  (Tr. at 331, 340-41, 616).  The Court finds the testimony of both Rodriguez and Koci credible.

51.  Eventually, Rodriguez and Koci began to market Atlantic's services through targeted direct mailing.  Rodriguez and Koci compiled mailing lists based on "center points," which were generally locations where Koci or Rodriguez had performed polybutylene replacement work for Phoenix in the past.  (Tr. at

234-45; 299).  Davis assisted Defendants's marketing campaign by providing information to aid in the selection of "center points." (Pl.'s Koci Direct (Tr. at 299); Pl.'s Davis Direct (Tr. at 234-35).

52.  Based on his employment and subcontractor relationship with Phoenix, Rodriguez was aware of Phoenix's pricing structure for polybutylene replacement services.  In competing against Phoenix, he relied on this knowledge to attempt to price polybutylene replacement services at a lower rate than Phoenix. (Pl.'s Rodriguez Direct, Tr. at 43-130).

53.  Defendants paid several Phoenix employees as their own part-time subcontractors.  Based on their knowledge of Phoenix's pay scale for its employees, Defendants paid their part-time subcontractors slightly more than Phoenix paid.  (Pl.'s Rodriguez Direct, Tr. at 75).

54.  Although Koci came across a copy of a Phoenix "pay sheet" while cleaning out Atlantic's office, neither Rodriguez nor Koci retained a Phoenix "pay sheet" for use in competition with Phoenix.  (Tr. at 326-27).  Credible evidence establishes that Rodriguez and Koci relied on their memories pertaining to what Phoenix paid them as subcontractors in determining what to pay Atlantic's subcontractors and employees.  (Tr. at 325).

E.  Atlantic's Use of Former Phoenix Employees

55.   Davis was employed by Phoenix as a project manager and estimator from January 1998 until September 2004.  (Davis Direct, Tr. at 207-37).

55.   At various times before Rodriguez and Koci terminated their subcontractor relationships with Phoenix, they had several conversations with Davis in which they asked Davis to work for the business that would later be known as Atlantic.  Rodriguez and Koci initiated some of these conversations, while Davis initiated others.  (Davis Direct; Tr. at 207-37).

56.   Davis remained a Phoenix employee until September 2004, at which time he took a position with Home Input, a home improvement company.  In December 2004, Davis went to work for Atlantic and remained there until February 2005.  (Tr. at 209). The Court finds that Davis did not leave Phoenix due to inducement on the part of Rodriguez and Koci.  The Court finds instead that Davis left Phoenix because he was dissatisfied with his work, and his discussions with Rodriguez and Koci about potential employment with Atlantic were mutual. (Tr. at 213-15).

57.   Atlantic hired Nerri Serrano ("Serrano"), another former Phoenix employee, on March 15, 2004, within the one-year contractual prohibition period.  (Tr. at 176).  Plaintiff claims that Defendants induced him to leave.  However, the credible evidence shows that neither Rodriguez nor Koci solicited or

induced Serrano to leave Phoenix's employment.   (Tr. at 176-77; 315).

F.   Defendants' Use of Phoenix's Re-Pipe Agreement

58.   The Re-Pipe Agreement was not marked or noticed with copyright protection information.   It was not kept hidden or secret from Phoenix's independent contractors, and during the time that they worked for Phoenix, Rodriguez and Koci were never advised that it was confidential, original, or protected.   (Tr. at 150-153, 263).

59.   Rodriguez and Koci retained a copy of the Re-Pipe Agreement after terminating their subcontractor relationships with Phoenix.   (Tr. at 269).

60.   In or around June 2003, Defendants retained an attorney, W. Franklin Pugh ("Pugh"), to determine whether they could use the Re-Pipe Agreement.   Pugh advised Defendants that the Re-Pipe Agreement was not subject to copyright protection and that they were entitled to use it.   Nevertheless, Defendants asked Pugh to draft a new consumer contract for use in Atlantic's polybutylene replacement services.   (Tr. at 156-57; 261-63; 301-03).

61.   From the beginning of Atlantic's existence, Defendants had entered into written agreements with their customers before performing polybutylene replacement services.   Initially,

Defendants used a blank form proposal sheet purchased from an office supply store for each of their contracts.  (Tr. at 63-64).

62.  Pugh drafted a new consumer contract for Defendants (the "Infringing Contract") by making minor revisions to the Re-Pipe Agreement and forwarded the Infringing Contract to Defendants under an August 5, 2003 cover letter. (Tr. at 157-58, Tr. at 202-03).

63.  Defendants first used the Infringing Contract on August 30, 2003 and then used it intermittently until mid-to-late October 2005.  At that time, Defendants began to use the Infringing Contract for virtually all of their polybutylene replacement jobs.  (Tr. at 281-84).

64.  Generally, the execution of the Infringing Contract was the final step performed before Defendants began work. Defendants would always perform an estimate at a potential work site and offer the potential customer a proposal for the cost of Atlantic's polybutylene replacement services.  (Tr. at 160-67). If the potential customer accepted Defendants' proposal, Defendants would schedule a work date with the customer.  (Tr. at 167).  In all cases, Defendants would not send the Infringing Contract to the customer until after the customer's acceptance of Defendants' proposal and the scheduling of a work date.  (Tr. at 167-68).  In many cases, moreover, Defendants did not send the

Infringing Contract until after the customer had paid a deposit equaling one-third of the estimated price.  (Tr. at 205-06, 312).

65.  Customers chose to have Atlantic perform their polybutylene replacement services for a variety of reasons, including experience and price.  Business was obtained by using flyers, neighborhood referrals, websites, Long & Foster Home Service Connection, neighborhood signs and postcards.  (Tr. at 155-60; 233-24; 243-44).  Atlantic also charged lower prices than Phoenix in order to attract business. (Tr. at 183).  Neither Rodriguez nor Koci ever had a customer tell them that they chose Atlantic because of the Infringing Contract.  (Tr. at 304).

66.  On several occasions, Defendants attempted to collect balances owed by customers by issuing written correspondence, which cited specific provisions of the Infringing Contract, to these customers.  (Tr. at 307).

67.  On April 1, 2005, Defendants began to perform a polybutylene replacement job for a customer named Oakley.  (Pl.'s Ex. 50).  After the job's completion but before Defendants received payment in full, Defendants issued a letter quoting Section Six of the Infringing Contract.  (Tr. at 308).  After the issuance of this letter, Oakley fully satisfied the unpaid balance, indicating in writing that he remitted payment because of his satisfaction with Defendants' work.  (Tr. at 311).

-18-

68.   On September 3, 2004, Defendants performed polybutylene replacement services for a customer named Polk.  (Pl.'s Ex. 50). Polk did not pay in full, and Defendants instituted a civil action to enforce the terms of the Infringing Contract and collect payment.  (Tr. at 308).  Defendants' action against Polk was successful, and Defendants spent approximately $1,500 in legal fees to collect the $1,606 owed by Polk.  Defendants received no award of their attorneys' fees.  (Pl.'s Ex. 50; Tr. at 561-62).

69.   On July 27, 2005, Defendants commenced polybutylene replacement work for a customer named Bennett.  (Pl.'s Ex. 50). After the job's completion, Bennett paid the full amount due except for $400.  (Tr. at 559).  Defendants issued two letters to Bennett, quoting specific language in the Infringing Contract. Despite these letters, Bennett never paid the money that Defendants claimed.  (Tr. at 558).  Defendants eschewed any further attempts at collection, concluding that it would have been more costly to enforce the contract than to write off the $400 allegedly due.  (Tr. at 558-59).

70.   On June 8, 2005, Defendants began a polybutylene replacement job for a customer named Quagliata.  (Pl.'s Ex. 50). After the completion of the work, Defendants instituted a civil action to enforce the terms of the Infringing Contract and collect the amount due.  (Tr. at 560-61).  In total, Defendants

-19-

spent approximately $7,000 in legal fees to collect a balance due of approximately $3,618.00.  (Tr. at 560-61; Pl.'s Ex. 50).

71.  As of July 20, 2006, a customer named Neal owed Defendants approximately $2,800 for polybutylene replacement services.  Defendants have invoked the terms of the Infringing Contract and spent approximately $1,000 to $1,500 in legal fees in an attempt to collect the amount due.  Despite these efforts, Defendants have not collected any amount from Neal.  (Tr. at 562-63).

72.  On August 4, 2005, Phoenix registered the Re-Pipe Agreement with the United States Copyright Office.  (Pl.'s Ex. 4B).  Phoenix did not provide notice to Defendants of the copyright registration or issue a cease-and-desist letter.  (Tr. at 139-40).  Phoenix filed the instant action before it received notice of the copyright registration.  (Tr. at 140).

73.  In September 2005, Defendants were informed by counsel that they were not entitled to use the Infringing Contract, as it was based on the Re-Pipe Agreement.  (Tr. at 264, 320).  Defendants then paid counsel $2,711.00 to draft a new contract for use with respect to their polybutylene replacement services.  (Tr. at 320).

74.  Defendants continued to use the Infringing Contract consistently until December 12, 2005 and intermittently thereafter. (Tr. at 262-268).

75.   In January 2006, after 626 total uses, Defendants ceased using the Infringing Contract altogether.  (Tr. at 446-47).

76.   From August 30, 2003, when Defendants began to use the Infringing Contract, until January 16, 2006, the last time the Infringing Contract was used, Defendants garnered $2,604,749.74 in revenue from polybutylene replacement jobs in which they used the Infringing Contract.  (*See* Pl.'s Ex. 71; Tr. at 442-47).

77.   Atlantic's gross profit margin was 68.55% for the twelve months that ended on December 31, 2005 and 69.12% for the twelve months that ended on December 31, 2004.  (*See* Pl.'s Ex. 73).

## V.   Conclusions of Law

A.   Count I - Copyright Infringement

78.   On July 7, 2006, this Court granted Phoenix's motion for summary judgment as to Defendants' liability for copyright infringement.  The Court reserved the issue of damages for trial.

79.   The Copyright Act provides that "an infringer of a copyright is liable for either - (1) the copyright owner's actual damages and any additional profits of the infringer . . . ; or (2) statutory damages . . . ."  17 U.S.C. § 504(a).

80.   A plaintiff may not seek statutory damages "for any infringement of plaintiff's copyright that commenced prior to the effective date of copyright registration, regardless of whether

-21-

the infringement continues after the effective date of copyright registration." *X-It Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 227 F. Supp. 2d 494, 527-528 (E.D. Va. 2002). Commencement occurs when the first act of infringement in a series of ongoing infringements occurs. *Johnson v. Jones,* 149 F.3d 494, 506 (6th Cir. 1998); *Singh v. Famous Overseas, Inc.,* 680 F. Supp. 533, 535 (E.D.N.Y. 1998), *aff'd* 923 F.2d 845 (2d Cir. 1990). Infringement does not "commence" with each new act in an ongoing infringement. *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998)(citing *Johnson v. Univ. of Virginia,* 606 F. Supp. 321, 325 (W.D. Va. 1985)).

81. Here, Defendants began using the Infringing Contract on August 30, 2003. Phoenix did not register the Re-Pipe Agreement until August 4, 2005. Therefore, the commencement of infringement predated registration by nearly two years, and Phoenix is not entitled to statutory damages.

82. Phoenix has set forth no claim for actual damages for the infringement, but rather seeks the profits that are attributable to Defendants' infringement of the Re-Pipe Agreement. The Copyright Act provides that a copyright owner is entitled to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). In determining the profits of the infringer that are attributable to

-22-

the infringement, the Act requires that a two-step procedure be used:

> In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

*Id.*

83.   "Gross revenue," as defined in 17 U.S.C. § 504(b), "does not mean the infringer's gross revenue from all of its commercial endeavors." *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 511 n.9 (4th Cir. 2002).   Instead, "a copyright owner is only entitled to present the gross revenue for the infringer's line of business or project related to the infringement." *Id.*   The copyright holder must establish the existence of a causal link between the infringement and the infringer's gross revenue before the burden-shifting provisions of § 504(b) will apply.   *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005).

84.   In this case, Phoenix claims that Defendants derived $2,604,749.74 in "gross revenue" from their use of the Infringing Contract.   (*See* Pl.'s Ex. 71; Dacy Direct).   At trial, Phoenix presented evidence and arguments pertaining to three purported causal links between Defendants' infringement and Defendants' revenue from polybutylene replacement jobs where they used the Infringing Contract.

-23-

85.  First, Phoenix maintains that Defendants' infringement directly resulted in additional success in attracting customers. Specifically, Phoenix argues that the Infringing Contract enabled Defendants to market themselves as identical to Phoenix with respect to the terms and conditions of their services, yet lower priced than Phoenix because of lower overhead.  Phoenix also claims that the infringement assisted Defendants in presenting themselves as polished and professional.  After viewing the evidence, however, the Court concludes that this purported causal link is mere speculation.  Rodriguez and Koci both testified that they never received any indication that a customer selected Atlantic for polybutylene replacement services because of the contract it was using.  The Court finds their testimony credible. The evidence demonstrates that customers hired Atlantic for reasons such as Defendants' experience and the prices Atlantic charged, not that customers sought out Atlantic because of the particular terms and conditions of its services or any appearance created by the use of the Infringing Contract.  In contrast, Phoenix has not presented any evidence that supports this particular causation theory.  As such, the Court concludes that this theory is too speculative to establish a causal link under §504(b).  *See Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 524-26 (4th Cir. 2003) (granting summary judgment where, despite the existence of a conceivable causal connection between

-24-

an infringement and certain gross revenues, the plaintiff offered
only speculative evidence of that supposed causal link).   86.
Second, Phoenix argues that the infringement enabled Defendants
to retain an unspecified amount of money, which would otherwise
would have been used to meet necessary expenditures, as gross
revenue.  Virginia law requires licensed residential contractors
"to make use of a legible written contract clearly specifying the
terms and conditions of the work to be performed."  18 Va. Admin.
Code § 50-22-260(B)(8).  Defendants' use of the Infringing
Contract allowed them to meet this regulatory requirement for a
time without incurring the expenses necessary to do so.  The
evidence establishes, however, that Defendants have paid counsel
$2,711.00 to draft a new polybutylene replacement contract.  Any
expense avoidance enabled by the infringement was merely
temporary and clearly has not permanently contributed to
Defendants' revenues.

87.  Third, Phoenix points to the fact that the Infringing
Contract had specific revenue-saving language that delineated
Atlantic's responsibilities for certain types of property damage
claims.  Phoenix claims that Defendants relied on this language
to demand payment from its customers on several occasions,
thereby retaining within the overall "gross revenue" pool revenue
that would have otherwise been uncollectible.  The evidence shows
that Defendants relied on specific provisions of the Infringing

-25-

Contract to collect amounts due from customers on five occasions. The only occasion where Defendants successfully collected more money than it cost them to enforce the Infringing Contract's terms occurred in the Polk case.  Defendants spent approximately $1,500 in legal fees to collect the $1,606.00 owed by Polk and did not receive an award of attorneys' fees.  The meager proceeds from the Polk case are more than offset by the approximately $7,000 spent by Defendants to enforce the Infringing Contract in the Quagliata case, where $3,618.00 was at issue.  Defendants also relied on the Infringing Contract to collect from Bennett and Neal, two customers who have never paid the balances due Defendants.  Finally, Defendants cited the Infringing Contract's terms in a letter to Oakley, who fully paid the amount due because of his satisfaction with Defendants' work.  In short, the Infringing Contract's revenue-saving language did not, in actuality, contribute to Defendants' gross revenue.

88.  Phoenix has not proven the existence of a causal link between Defendants' infringement of the Re-Pipe Agreement and their gross revenue from polybutylene replacement jobs where the Infringing Contract was used.  Accordingly, the burden-shifting provisions of § 504(b) are inapplicable to this case.  *See Bonner*, 404 F.3d at 294.  The Court concludes that Phoenix is not entitled to any profits under Count I.

89.   Phoenix also requests that the Court permanently enjoin Defendants from infringing Phoenix's copyright of the Re-Pipe Agreement.

90.   The Copyright Act bestows upon the Court the ability to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  Under this provision, a copyright holder that establishes past infringement and a substantial likelihood of future infringement is ordinarily entitled to a permanent injunction against the infringer. *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1555 (10th Cir. 1996); *Walt Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C. Cir. 1990); *Pacific and So. Co., Inc. v. Duncan*, 744 F.2d 1490, 1499 (11th Cir. 1984).

91.   Here, Phoenix has unquestionably established past infringement of its copyright in the Re-Pipe Agreement.  The Court granted Phoenix's motion for summary judgment with respect to Defendants' liability for infringement.  Furthermore, copies of the Infringing Contract remain within Atlantic's customer files, and the Infringing Contract could easily be reproduced for future polybutylene replacement jobs.  Accordingly, the Court concludes that there is a substantial likelihood of future infringement.  Phoenix is entitled to a permanent injunction

-27-

against any future infringements by Defendants of Phoenix's copyright in the Re-Pipe Agreement.

B.  Counts II and III - Breaches of the Subcontractor Agreements

92.  Rodriguez and Phoenix are parties to a written Subcontractor Agreement dated March 23, 2000.  Koci and Phoenix are parties to a written Subcontractor Agreement dated February 25, 2000.  Rodriguez and Koci each terminated their respective Subcontractor Agreements on June 18, 2003.

93.  Phoenix's complaint in this matter alleged that, after the termination of their Subcontractor Agreements, Rodriguez and Koci both breached three provisions of the Agreements:  (1) the covenant not to compete and not to solicit Phoenix's prospective customers or clients; (2) the covenant not to solicit Phoenix employees; and (3) the confidentiality agreement.

94.  As an initial matter, Defendants argue that their Subcontractor Agreements are unenforceable due to a lack of consideration.  Defendants claim that both Rodriguez and Koci entered into the Subcontractor Agreements upon the promise of continued work with Phoenix.  They contend that this is insufficient consideration under Virginia law.  *See Mona Elec. Group, Inc. v. Truland Serv. Corp.*, 193 F. Supp. 2d 874, 876 (E.D. Va. 2002) (predicting that the Virginia Supreme Court "would find that the mere continuation of employment does not furnish consideration for a non-competition agreement").

-28-

95.   In fact, the Virginia Supreme Court rejected this argument in an opinion that was rendered before *Mona*.   In *Paramount Termite Control Co. v. Rector*, 380 S.E.2d 922 (Va. 1989, the Virginia Supreme Court held that continued employment furnished sufficient consideration to support a covenant not to compete.   *Id.* at 926.   Thus, in this case, the Subcontract Agreements were supported by consideration.

96.   There is no evidence in this case that either Rodriguez or Koci "directly or indirectly through a third party, engage[d] in any business directly or indirectly related to the replacement of polybutylene pipe for any customer or client, or any affiliate of any customer or client, for which the Subcontractor has performed services under this Agreement," as is prohibited by the covenants not to compete in their Subcontract Agreements.   (*See* Pl.'s Ex. 8; Pl.'s Ex. 13).

97.   On July 7, 2006, this Court issued a Memorandum Opinion concluding that the covenants not to solicit Phoenix's prospective customers or clients were geographically overbroad and, thus, unenforceable.   *See Phoenix Renovation Corp. v. Rodriguez*, No. 05-1196, 2006 U.S. Dist. LEXIS 46005, *26-27 (E.D. Va. July 7, 2005).   Upon Defendants' motion for partial summary judgment, the Court entered an Order dismissing Counts II and III to the extent that they relied on these nonsolicitation clauses.

98.   On July 20, 2006, upon Defendants' motion for judgment as a matter of law, the Court dismissed Counts II and III insofar as they relied on the covenants not to solicit Phoenix employees. Phoenix's claims under these particular covenants were based on Defendants' alleged solicitation of Serrano and Davis.  The Court found that Serrano terminated his relationship with Phoenix to join Atlantic as a full-time employee in March 2004, but that this action was the result of Serrano's own initiative and not any solicitation or inducement on the part of Rodriguez or Koci. The Court also found that Davis did not leave Phoenix's employment until September 2004, several months after the expiration of the covenants not to solicit Phoenix employees. (Tr. at 526-28).  Finally, Phoenix conceded that it did not suffer any damages as a result of any unsuccessful solicitations of Davis before this time.  (Tr. at 500).  Accordingly, the Court concluded that Phoenix had not presented any evidence that Rodriguez or Koci violated the covenant not to solicit Phoenix employees.  (Tr. at 528).

99.   The remaining question before the Court is whether Rodriguez or Koci violated the confidentiality provisions of their Subcontractor Agreements.

100. These confidentiality clauses prohibited Defendants' disclosure or use of the following:

> customer lists, price lists, insurance and other third
> party contracts, marketing and sales and concepts,

> identity of key customer or client personnel and their
> phone numbers, the identity and requirements of customers
> and clients, bidding and pricing information, personnel
> policies and procedures, compensation and fringe benefit
> programs and other sales, marketing and technical
> information, business plans and methods, computer
> programs and copyrightable work (models, processes,
> designs, drawings, plans, prototypes, inventions,
> devices, parts, improvements and other physical and
> intellectual property)

(Pl.'s Ex. 8, Pl.'s Ex. 13).  Since the confidentiality agreement
is a restraint on trade, the Court will strictly construe it
against the employer.  *See Simmons v. Miller*, 544 S.E.2d 666, 678
(Va. 2001) (strictly construing a covenant not to compete).

101. The evidence educed at trial established that
Defendants conducted business in a manner that required some
reliance on knowledge that they gained through performing
polybutylene replacement work for Phoenix.  Specifically,
Defendants conducted marketing campaigns targeted toward streets
and neighborhoods that they knew to be rich in houses with
polybutylene pipes.  This knowledge stemmed from the prior work
done by Rodriguez and Koci for Phoenix.  Also, Rodriguez had some
familiarity with Phoenix's pricing structure and endeavored to
offer polybutylene replacement services at a lower price than
Phoenix.  Finally, Defendants resolved to compensate their
employees and subcontractors at higher rates than their
competitors, based in part on their knowledge of Phoenix's
compensation rates.

102. The confidentiality clauses in Defendants' Subcontractor Agreements prohibit disclosure and use of "customer lists," "identity of key customer or client personnel and their phone numbers," and "the identity and requirements of customers and clients." These restrictions, on their face, do not prohibit disclosure or use of prior job locations or prior customer addresses.

103. The confidentiality clauses also purport to prohibit disclosure or use of "price lists" and "bidding and pricing information." These words "price," "bidding," and "pricing" clearly refer to the rates charged by Phoenix to customers. Rodriguez testified that he relied, in part, on his familiarity with Phoenix's pricing structure in his attempts to offer polybutylene replacement at a lower price than Phoenix. The information used by Rodriguez was not "confidential" or "proprietary" in any sense of the word, however. Rather, the information was readily available from any potential customer who had also obtained an estimate from Phoenix. The evidence before the Court does not establish that Defendants used confidential "price lists" or "bidding and pricing information."

104. The confidentiality clauses contain no restriction on Defendants' use of knowledge pertaining to what they, themselves, earned as Phoenix subcontractors.

105. There is no other evidence indicating that Rodriguez and Koci had access to any of the other categories delineated as confidential information in their Subcontractor Agreements. Although Phoenix maintained a proprietary customer database, it is undisputed that Rodriguez and Koci were unable to access the database.

106. In *Peace v. Conway*, 435 S.E.2d 133 (Va. 1993), the Virginia Supreme Court held that an "agent is entitled to use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent." *Id.* at 135. *Peace* presented a situation where the plaintiff's former employees formed a competing business, compiled a list of the plaintiff's customers by using their memories, and solicited these customers. *Id.* at 134. Emphasizing that the defendants "did not take any documents or utilize any property" that belonged to the plaintiff, the Virginia Supreme Court held the defendants' method competition was proper. *Id.* at 135.

107. The defendants in *Peace* were not bound by employment agreements, and the Virginia Supreme Court considered only a tort theory in that case. *See id.* at 134. Nevertheless, the Court concludes that the agency principles set forth in that case are instructive with respect to the confidentiality agreements at issue in the instant case. While Defendants were contractually

-33-

prohibited from using any confidential information that fell into the categories specifically delineated in their confidentiality agreements, Defendants were entitled to use any other information gained while working at Phoenix, provided that they did not acquire such information in violation of their duties as agents.

108. Like the defendants in *Peace*, Rodriguez and Koci did not use Phoenix's "job worksheets" or "pay sheets" to gain any type of competitive advantage over Phoenix.  Rather, the evidence establishes that they remembered what they were paid as Phoenix subcontractors and relied exclusively on this memory to establish compensation rates for their own employees and subcontractors. Likewise, the evidence demonstrates that Rodriguez and Koci remembered many streets and neighborhoods where the houses contained polybutylene pipes and that they relied solely on this knowledge to target their marketing activities.  Finally, Defendants relied solely on Rodriguez's memory in their attempts to offer lower-priced services than Phoenix.

109. The only evidence that Defendants used any of Phoenix's property or documents is their use of the Re-Pipe Agreement to create the Infringing Contract.  As the Court has already concluded, however, Defendants did not gain any additional revenue from their use of this information.  Phoenix has not presented any evidence pertaining to actual damages resulting from Defendants' use of the Infringing Contract.

-34-

110. In sum, while Defendants used general information concerning Phoenix's method of business, there is no evidence that they used or disclosed any confidential or proprietary information gained through their subcontractor relationships with Phoenix.

## C.  Count IV - Tortious Interference with Phoenix's Contracts and Business Expectancies

111. Phoenix's evidence with respect to this count focused solely on the claim that Defendants induced Davis to violate his employment agreement with Phoenix.  It claimed that Davis entered into a covenant not to compete with Phoenix and a confidentiality agreement.  According to Phoenix, Davis violated these provisions by working for Atlantic and supplying confidential information to Defendants.

112. A Virginia claim for tortious interference with an employment contract or business expectancy requires proof of: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985).

113. On July 20, 2006, upon Defendants' motion for judgment as a matter of law, the Court dismissed Count IV.  The Court

concluded that Phoenix failed to present any evidence of the first element under the *Chaves* test, namely its contractual relationship with Davis or its business expectancy with respect to Davis.  (Tr. at 529-30).

D.  Counts V and VI - Tortious Interference with Phoenix's Contracts with Rodriguez and Koci

114. Count V alleges that Koci tortiously interfered with Phoenix's Subcontract Agreement with Rodriguez.  Count VI alleges that Rodriguez tortiously interfered with Phoenix's Subcontract Agreement with Koci.

115. Again, a tortious interference claim requires proof of "intentional interference inducing or causing a breach or termination of the relationship or expectancy."  *Chaves*, 335 S.E.2d at 102.  In other words, as an element of Counts V, Phoenix must prove that Rodriguez breached his Subcontract Agreement.  The same holds true for Count VI and Koci's Subcontract Agreement.  As stated above, there is no evidence that either Rodriguez or Koci breached his Subcontract Agreement. As such, Defendants are entitled to judgment on Counts V and VI.

E.  Count VII - Conspiracy to Wilfully and Maliciously Injure Plaintiff in its Business

116.  Count VII alleges that Defendants conspired to willfully and maliciously injure Plaintiff in its business, in violation of Va. Code. § 18.2-499.  Plaintiff specifically alleged that Defendants conspired to (1) infringe on Plaintiff's

-36-

copyright interests; and (2) intentionally misappropriate Plaintiff's business methods and plans, and unlawfully soliciting Plaintiff's employees.

117.   Under Virginia law, any person who procures the participation of others in an attempt to wilfully and maliciously injure another in his reputation, trade, business, or profession can be liable for statutory conspiracy.  *See* Va. Code § 18.2-499. A plaintiff proceeding under this statute must prove its case by clear and convincing evidence.  *See id.* at § 18.2-500; *Tazewell Oil Co., Inc. v. United Va. Bank,* 413 S.E.2d 611, 619 (Va. 1992). An act is "wilful and malicious" under the Statute if it was undertaken to "injure the plaintiff intentionally, purposefully, and without legal justification." *Simmons v. Miller,* 544 S.E.2d 666, 667 (Va. 2001).

118.   Plaintiff first alleges that Defendants conspired to infringe on its copyrighted interests by using a copyrighted Re-Pipe agreement in 2003, prior to the forming of Atlantic. Defendants do not dispute using the Agreement. However, convincing evidence shows that in 2003, when Defendants decided to use the Re-Pipe Agreement, it was not copyrighted, as Plaintiff did not register a copyright with the United States Copyright Office until August 2005.  Furthermore, in or around June 2003, Defendants sought and relied upon advice of counsel Pugh that the Re-Pipe Agreement was not subject to copyright

protection, and further relied upon Pugh in requesting that he draft the Infringing Contract.

119.   Plaintiff did not establish, by clear and convincing evidence, that an agreement to wilfully and maliciously infringe upon Plaintiff's copyright in 2003.  First, the fact that no copyright existed eliminates a conspiracy to infringe, because one simply cannot infringe upon a copyright that does not exist. Second, Defendants' reliance upon advice by counsel and the drafting of the agreement by counsel eliminates the "wilful and malicious intent" prong of the statute.  Therefore, no conspiracy to infringe Plaintiff's copyrighted interests existed in 2003.

120.   Plaintiff alternatively argued that Defendants conspired to infringe copyright interests in August 2005, following the formation of Atlantic, and Phoenix's registration of the Re-Pipe Agreement with the United States Copyright Office. Although at that time a copyright existed, which was infringed (*see* Pl.'s Ex. 4B; *see infra* Part V), the Court finds that Plaintiff failed to prove a statutory conspiracy existed between Koci and Rodriguez.

121.   A conspiracy under Va. Code § 18.2-499 requires a showing that two or more persons acted in concert. *Charles E. Brauer Co., Inc. v. NationsBank of Virginia,* 466 S.E.2d 382, 387 (Va. 1996).  A corporate entity, which acts only through its agents, cannot conspire with itself, so a conspiracy cannot exist

if Defendants were agents of the same principle acting within the scope of agency. *Fox v. Deese,* 362 S.E.2d 699, 708-09 (Va. 1987). Virginia has not recognized the so-called "personal stake" exception to this general rule when the conspiring agent has an independent personal stake in achieving the conspiracy's illegal objective. *See Softwise, Inc. v. Rana Goodrich, M.D., P.C.,* 63 Va. Cir. 576, 578 (Va. Cir. Ct. 2004).

122.   The evidence presented shows that Defendants, through Atlantic, did infringe copyrighted material in 2005.  However, at the time before and after Phoenix copyrighted the Re-Pipe Agreement, Defendants had already formed Atlantic and were acting as agents of Atlantic in infringing the copyright.  Because Defendants were acting as agents of the same principal, within the scope of their agency relationship, a conspiracy is legally impossible.  Furthermore, the personal stake exception is unavailable under Virginia law.

Finally, Plaintiff once again fails to show a willfull and malicious intent to infringe.  Because Phoenix never provided notice to Defendants of the copyright registration or issued a cease-and-desist letter, Defendants were unaware of any possible infringement until September 2005, when they were so informed by counsel, after which time the drafting of a new agreement was requested.

123.   Plaintiffs did not prove, by clear and convincing evidence that Defendants willfully and maliciously conspired to infringe its copyrighted material.  For the foregoing reasons, this Court finds no liability on the statutory conspiracy claims alleged in Count VII.

F.   Count IX - Common Law Conspiracy

124.   A common law conspiracy exists under Virginia law where "two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose, or some lawful purpose by a criminal or unlawful means." *Commercial Business Systems, Inc. v. Bellsouth Services, Inc.,* 453 S.E.2d 261, 267 (Va. 1995).  The foundation of a civil conspiracy is damage caused by the acts committed in furtherance of the conspiracy. *Id.*

125.   Plaintiff did not prove that an agreement to achieve an unlawful purpose or a lawful purpose by an unlawful means existed.  Plaintiff failed to prove any agreement between the Defendants to breach subcontractor agreements, tortiously interfere with contract,  tortiously interfere with business expectancy claim, or undertake unfair competition.  Plaintiff only proved that Defendants infringed upon its copyright in 2005, after Atlantic had been formed.  The intracorporate immunity doctrine, as recognized by Virginia, once again makes conspiracy

-40-

a legal impossibility.  Therefore, no common law conspiracy exists.

## VI.  Conclusion

For the foregoing reasons, this Court finds:

(1) With respect to Count I, Defendant infringed Plaintiff's copyright interests, but is not liable for damages.  Plaintiff is entitled to a permanent injunction against Defendants from continued infringement in the future.

2) With respect to Counts II and III, Defendants are not liable for breaching subcontract agreements or

3) With respect to Count IV, Defendants are not liable for tortious interference with contracts and business expectancies.

4) With respect to Counts V and VI, Defendants are not liable for tortious interference with contract rights.

5) With respect to Count VII, Defendants are not liable for statutory conspiracy.

6) With respect to Count IX, Defendants are not liable for common law conspiracy.


October 25, 2006                    _____/s/_____
Alexandria, Virginia                        James C. Cacheris
                                    UNITED STATES DISTRICT COURT JUDGE